IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

HARRIET E. MORRIS,

      Plaintiff,

vs.                                                            CASE NO. 1:14-cv-69-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits (DIB).  (Doc. 1.)  The Commissioner has answered, Doc. 11, and both parties have filed briefs outlining their respective positions.  (Docs. 16, 19.) For the reasons discussed below, the Commissioner's decision should be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff applied for a period of disability and DIB on March 21, 2011, alleging disability since January 4, 2010. (R. 204-07.)  Her applications were denied initially and upon reconsideration.  (R.15-33.)  A hearing was held before an Administrative Law Judge (ALJ) John D. Thompson, Jr. on September 20, 2012.  The ALJ denied Plaintiff's claims in a decision dated December 7, 2012. (R. 18-33.)  The Appeals Council denied Plaintiff's request for review on February 26, 2014, rendering the ALJ's decision the Commissioner's final decision.  (R. 1-3.)  On July 12, 2013, Plaintiff filed the instant

appeal to this Court.  (Doc. 1.)  On appeal, Plaintiff challenges whether Plaintiff's right

to a fair hearing was violated because the ALJ was not a neutral factfinder.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[9]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14]   Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

---

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] *See id.*

### III.  SUMMARY OF THE RECORD

### A. Medical Record Evidence

Plaintiff's medical history centers around her treatment for depression, anxiety, and PTSD.  Beginning in 2000 to 2003, Plaintiff sought treatment for depression from psychologist Dr. Helen Cadiz. (R. 291-360.)  Dr. Cadiz diagnosed Plaintiff with major depression and Post Traumatic Stress Disorder ("PTSD") related to the murder of her older sister. In May of 2002 Dr. Cadiz noted that Plaintiff's depression was in full remission. (R. 293.)

Plaintiff presented for treatment again in 2010 with Dr. Innocent Odocha for depression, panic attacks, and anxiety. (R. 364.)  Dr. Odocha diagnosed Plaintiff with insomnia, anxiety state unspecified, depressive disorder not elsewhere classified, nondependent tobacco use disorder, and shortness of breath.   Dr. Odocha prescribed Plaintiff a low dose of Klonopin and Lexapro to treat her anxiety and depression.

In May of 2011, Plaintiff was examined by psychologist Dr. Umesh Mhatre. (R. 379-381.)  Plaintiff related her prior mental health treatment, denying a history of inpatient psychiatric treatment, and stated that she had previously taken Zoloft, but it did not help.  She told Dr. Mhatre that her brother had recently died under mysterious circumstances and her sister had recently died of cancer.  Dr. Mhatre diagnosed Plaintiff with dysthymia (mild, long-term depression) and stated that Plaintiff would benefit from the use of antidepressants. (R. 381.)   Dr. Mhatre noted that Plainitff had no evidence of psychosis or pressured speech and that she had intact cognition and insight/judgment.

Plaintiff returned to Dr. Cadiz for therapy on May 25, 2011. (R. 404-05.)  She reported several upsetting incidents to Dr. Cadiz, including the deaths of her brother and sister and her current unemployment after termination.  Dr. Cadiz again diagnosed Plaintiff with major depression, recurrent, and PTSD.   Dr. Cadiz recommended Plaintiff pursue individual therapy and treatment for symptoms of trauma.

Plaintiff saw Dr. Cadiz on July 13, 2011. (R. 407.)  Plaintiff discussed her family and her treatment issues and agreed to be referred to another psychologist, Dr. Eileen Diaz.   Dr. Cadiz noted that Plaintiff was alert and initially bright and hopeful, but became tearful when the issue of transfer to another psychologist arose.  Dr. Cadiz noted, however, that Plaintiff handled the issue well.

Plaintiff continued therapy with Dr. Diaz from July to November 2011. (R. 408-09; 421-444.)  In August of 2011, Plaintiff told Dr. Diaz that she had decided to start her own business. (R. 438-39.)  During the next few months, Plaintiff conducted research for a business plan. (R. 421-39.)  Plaintiff reported in November that she had attended meetings at the small business bureau to aid in development and had applied for a business license.  She continued to work on her business plan.

Plaintiff began seeing Ms. Gillian Nassau, a clinical social work intern, for mental health counseling in March and April of 2012. (R. 446-452.)  Ms. Nassau assessed Plaintiff with major depressive disorder, recurrent, moderate.  Plaintiff related her desire to get stronger and work towards occupational goals. In April 2012, Plaintiff reported applying for jobs, participating in an interior decorating program, and potentially pursuing an additional master's degree. (R. 447-449.)  In August 2012, Plaintiff reported

working with her sister, which evoked feelings from past trauma. (R. 481.)

Plaintiff saw Dr. Wierzbicki, a physician, from August 2011 to June 2012. (R. 453-480.)  He diagnosed Plaintiff with depression with anxiety and prescribed her Zoloft.   Throughout this period, Dr. Wierzbicki also treated Plaintiff for mild cystic acne, which he opined contributed to Plaintiff's depression.  In May of 2012,  Dr. Wierzbicki noted that Plaintiff's depression was stable and that she was doing well with therapy. (R. 456.)   Dr. Wierzbicki also stated that Plaintiff acne was improving with treatment. *Id.*

On June 13, 2011, Dr. Adrine McKenzie, a state agency psychologist, assessed the medical evidence and found that Plaintiff had major depression and PTSD. (R. 382-399.)  She concluded that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, but noted that she could carry out simple instructions and could get along with others in a work setting.  She found that Plaintiff could carry out simple, routine tasks.  Dr. Val Bee, another state agency psychologist, reviewed the medical evidence and affirmed the prior opinion. (R. 410.)

Aside from her treatment for mental health issues, Plaintiff had a tendon tear in her left shoulder and mild osteoarthritis as revealed by an MRI performed in August of 2012. (R. 482-83.)

## B.  Hearing Testimony

A board-certified clinical psychologist, Dr. John William Davis, M.D., testified as a medical expert at the hearing at the ALJ's request.  Dr. Davis reviewed Plaintiff's medical records and concluded that nothing in her medical history indicated an

impairment that rose to the level of meeting a listing. (R. 48.)  He Dr. Mhatre's diagnosis

of dysthymia, which he described as the mildest form of depression recognized. Dr.

Davis addressed the moderate limitation in concentration, persistence, and pace in Dr.

McKenzie's assessment and stated that he did not believe that a moderate limitation

was justified due to Plaintiff's academic success and her organized, goal-oriented

thoughts.  Dr. Davis concluded that Plaintiff had dysthymic disorder, agreeing with Dr.

Mhatre and Dr. McKenzie. He declined to find support for Dr. Cadiz's diagnosis of major

depression. (R. 49-53.)

Dr. Davis opined that if Plaintiff had a moderate degree of limitation in her

concentration, she would require a less complicated, repetitious work setting. (R. 55.)

He reiterated, however, that due to Plaintiff's completion of a master's degree, he had

trouble accepting that she had moderate limitations in concentration, rather believing

that she only had mild limitations. (R. 56-57.)  Upon examination by Plaintiff's

representative, Dr. Davis admitted that a person who experienced three deaths in the

immediate family within 12 to 14 months could possibly have PTSD, but clarified that he

did not believe Plaintiff had PTSD.  (R. 66-75.)

At the hearing, Plaintiff testified that she was 49 years old and had completed a

master's degree in management and leadership in 2005. (R. 76.)  She last worked as a

claims representative with the Social Security Administration in 2010, but left because

of stress and feelings of inadequacy. (R. 77-80.)  She related that she was constantly

looking for employment. (R. 89.)

She testified that she was currently seeing Dr. Noone as her primary physician

on a weekly basis for a torn ligament, depression, and acne.  Plaintiff stated that she would soon start physical therapy for her torn ligament. She was taking medication for her acne and Metformin for her diabetes, which was diagnosed a year prior to the hearing.  (R. 91-93.)

Plaintiff stated that she had to stop seeing Dr. Cadiz and Dr. Diaz for treatment because her insurance would not cover additional visits.  Plaintiff's vocational rehab program only covered counseling sessions for six months.  Plaintiff had started seeing a counselor, Ms. Gillian Nassau, about nine months before the date of the hearing on a biweekly basis.  She took Zoloft for her depression and anxiety. (R. 94-98.)

Plaintiff testified that her family helps her with groceries and transportation. She stated that she does not do much during the day - she tries to read, starts laundry, and forces herself to eat, but often does not finish these tasks due to her depression.  She does not have much of a social life, but occasionally visits her mother and family. She testified that her depression makes her cry frequently, makes her feel fatigued and not motivated, and makes it difficult for her to focus and remember. (R. 102-07.)

Upon examination by her representative, Plaintiff testified that within the last ten years, she has experienced seven deaths in her family. Her sister and a close friend were both murdered.  She stated that she is afraid of experiencing a similar fate, and she believes that she is affected by PTSD related to these incidents.  She stated that she cannot perform simple tasks consistently because she "feel[s] [herself] fall apart" under pressure. (R. 112-17.)

A vocational expert (VE) also testified at the hearing.  The VE testified that

Plaintiff's past relevant work was as a case manager, a sedentary job with an SVP of 7, a vocational rehabilitation counselor, a sedentary job with an SVP of 8, a claims representative, a sedentary job with an SVP of 8, a correctional officer, a medium work job with an SVP of 4, and a job development specialist, a sedentary job with an SVP of 5.  (R. 126-129.)

The ALJ posed a hypothetical to the VE consisting of an individual the same as Plaintiff, with the same educational background and past work experience, who could perform a full range of medium work with the limitation that there would be no lifting overhead with her left arm.  The hypothetical individual would be limited to simple, rote and repetitive tasks and response to oral or written directives, with only occasional contact with co-workers or occasional or less contact with co-workers or supervisors. She would have no contact with the general public and work in a low-stress work environment.  The VE testified that such an individual could not perform Plaintiff's past relevant work as actually performed or as customarily performed, because all of her past work was skilled or semi-skilled.  However, the VE testified that there were unskilled jobs available in the national and regional economies that Plaintiff could perform, including jobs such as a packer, stocker, cleaner, document preparer, lens inserter, and trimmer. (R. 129-138.)

### C.  ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements through September 30, 2015, and had not engaged in substantial gainful activity since January 4, 2010, her alleged onset date.  He determined that Plaintiff had the severe

impairments of anxiety and depression but did not have an impairment or combination of impairments that met or equaled the Listings.

The ALJ determined that Plaintiff had the RFC to perform medium work as defined in 20 CFR § 404.1567(c), except that she was limited to no lifting overhead with her left arm.  She was limited to simple rote and repetitive tasks in response to oral directives, with occasional or less contact with co-workers and supervisors and no contact with the general public.  She could perform adequately in a low-stress work environment where there is limited adaptation of function and should not have to meet any production goals or quotas.  The ALJ concluded that Plaintiff was unable to perform her past relevant work, but considering the her age, education, work experience, and RFC, she could perform other jobs that exist in the national economy, including packer, stocker, cleaner, document preparer, lens inserter, and trimmer.  The ALJ, therefore, concluded that Plaintiff was not disabled.  (R. 18-32.)

## IV.  DISCUSSION

Plaintiff contends that this case should be remanded because the ALJ was not a "neutral fact finder," and thus her right to due process under the Fifth Amendment was violated. As support for this argument, Plaintiff points to data purporting to show that the ALJ who denied Plaintiff's claim in this case, ALJ John D. Thompson, has a statistically lower-than-average rate of favorable disability rulings compared with the statewide average.  Specifically, Plaintiff asserts that "in Florida a claimant has a 63% chance of a Favorable Decision" and "[o]ut of one hundred citizens applying for benefits ALJ

Thompson dismisses and turns down 86 people."  (Doc. 16 at 6-7.)[15]

Plaintiff's counsel has advanced this same argument against ALJ Thompson several other times in Social Security Appeals in this Court.   *See Clark v. Colvin*, Case No. 1:13-cv-31-GRJ (N.D. Fla. 2014); *Barry v. Colvin*, Case No. 1:13-cv-89-MP-GRJ (N.D. Fla. 2014); *Elleby v. Colvin*, Case No. 1:13-cv-131-MP-GRJ (N.D. Fla. 2014).  For the same reasons the argument was rejected there, and as explained below, the Court does not have the authority to reverse and remand this decision simply because ALJ Thompson has a statistically lower-than average rate of favorable disability rulings.

A Social Security claimant is entitled to a full and fair hearing and the Eleventh Circuit has held that an ALJ shall not conduct a hearing if he or she is prejudiced with respect to a party to a case or has any interest in the outcome of the pending matter. *Miles v. Chater*, 84 F.3d 1397, 1401(11th Cir. 1996) (*citing* 20 C.F.R. § 404.940).  The court there noted the crucial role the ALJ plays in the disability review process, stating that "[n]ot only is he duty-bound to develop a full and fair record, he must carefully weigh the evidence, giving individualized consideration to each claim that comes before him." *Id.* The ALJ's impartiality is integral to the system.  *Id.*

The Social Security regulations require that the claimant present a claim of bias at the earliest opportunity. *Miles*, 84 F.3d at 1400.  The claimant must notify the ALJ if she objects to the assignment of a particular ALJ to her case.  If the ALJ refuses to withdraw, the claimant must seek reconsideration after the hearing by raising the issue

---

[15]The statistics relied upon by Plaintiff are available at
http://www.ssa.gov/appeals/DataSets/03_ALJ_Disposition_Data.html.

before the Appeals Council.  *Id.*  "A claim of bias is waived if the claimant is aware of

the facts giving rise to his bias claim, but fails to raise it in accordance with 20 C.F.R. §§

404.940, 416.1440."  *Stokes v. Astrue,*  2009 WL 2216785, *14 (M.D.Fla. 2009) (citing

*Hummel v. Heckler*, 736 F.2d 91, 94 (3d Cir.1984)).

The record does not reflect, and Plaintiff does not assert, that she challenged the

ALJ's impartiality during the administrative proceedings.  The statistics relied upon by

Plaintiff in her argument before this Court are not part of the administrative record in

this case.   Plaintiff points to nothing in the record of her administrative proceedings that

suggests that the ALJ was biased in deciding her disability claim, nor does the Court's

review of the record reflect such bias.   While the statistics relied upon by Plaintiff are

troubling and may merit scrutiny by the Commissioner, it is not the province of this

Court to make factual determinations regarding the relevance of such statistics to

Plaintiff's disability claim in the first instance. *See, Perkins v Astrue*, 2010 WL 3908598,

at *15-16 (E.D. Mo. Sept. 30, 2010)(holding that district courts are in no position to

judge what threshold percentage of "favorable decisions" is necessary to acquit an ALJ

of suspicion of intolerable bias).  Moreover, statistical evidence regarding an ALJ's

claim denial rate is generally insufficient to establish bias, in the absence of other

evidence reflecting actual bias on the part of the ALJ.  *See, e.g.*, *Grant v. Comm'r of*

*Soc. Sec.*, 111 F. Supp. 2d 556, 558-59 (M.D. Pa. 2000) ("[S]tatistics in and of

themselves may have limited probative value," but other evidence in the record,

including statements by the ALJ evincing bias, supported plaintiffs' bias claim.)

Accordingly, on this record, the Court concludes that because Plaintiff did not

raise this bias claim during the administrative proceedings and there is no other

evidence of bias apparent from the record, the claim of bias based on the ALJ's

disability ruling statistics is waived and foreclosed from review by this Court.  *See*

*Hummel*, 736 F.2d at 94.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED**.

**IN CHAMBERS,** in Gainesville, Florida, on the 7th  day of April 2015.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**